HAMITER, Justice.
The administratrix of the succession of Mrs. Maude Y. Tranum instituted this action to set aside certain purported donations inter vivos made by Mrs. Tranum to Calvin G. Arnold, a. nephew and the defendant herein. In her petition plaintiff alleged that the decedent was notoriously insane and incapable of managing her person and her affairs for approximately five years prior to her death which occurred on February 7, 19S5, and hence she lacked the capacity to make donations (particularly the ones in question) during that period.
The assailed purported gifts to defendant were the following: (1) January 4, *71 1952, stock in the First Federal Savings and Loan Association of Natchitoches having a value of $2,000, (2) April 7, 1953, funds on deposit in the Continental-American Bank and Trust Company of Shreveport amounting to $5,648.79 and (3) June 15, 1953, eighty-two shares of the capital stock of Woodley Petroleum Company.
The district court, after trial of the merits, concluded that Mrs. Tranum was mentally incapable of managing her affairs on and after March 7, 1953; and, accordingly, it rendered judgment in plaintiff’s favor annulling and setting aside the transfers of April 7, 1953 and June 15, 1953. But the court rejected plaintiff’s demand to set aside the donation of building and loan stock made on January 4, 1952.
Defendant appealed, and the plaintiff has filed an answer to the appeal in which she prays that this court annul also the building and loan stock transfer of January 4, 1952.
In the trial of this action appellee, as she concedes, was faced with a presumption of sanity on the part of the decedent; and, for overcoming it, she carried the burden of proving decedent’s alleged lack of capacity by strong, clear and convincing evidence. After carefully reading the testimony of the various witnesses and thoroughly considering the numerous documents introduced we agree with the trial judge that such burden has been discharged with respect to the purported donations of April 7, 1953 and June 15, 1953.
From the record it appears that Mrs. Tranum and her husband (they were childless) lived together in Shreveport for a number of years. After his death in 1939 she resided for some seven months in Campti, Natchitoches Parish, with Mrs. Myrtle Y. Perot (a sister and the plaintiff herein) and then returned to Shreveport, she living alone there in an apartment. On August 6, 1951, she suffered a collapse, due largely to malnutrition, and was hospitalized. Five or six days later she was removed to Campti where she made her home with Mrs. May Arnold, another sister and the mother of this defendant. It was while she was so living with Mrs. Arnold that the purported donations herein attacked were made. Subsequently, during July of 1954, and while still residing with Mrs. Arnold, Mrs. Tranum again became quite ill; and on October 14, 1954, by a judgment of the Natchitoches Parish District Court, she was interdicted. She died February 7, 1955.
To establish the decedent’s alleged incompetence^the plaintiff introduced the testimony of Dr. J. N. Brown, of Campti, who had attended and treated Mrs. Tranum from March 7, 1953, until her death. A part of it we quote as follows:
*73 “Q. You recall seeing Mrs. Tranum then on March 7th, 1953? A. Yes, sir.
“Q. You saw her on (and) after that, you say, on through 1954? A. I saw her, yes, I saw her in ’54 and some in ’55.
“Q. Up until the time just before she died — not too long before she died? A. Yes, I saw her the day she died. I saw her several times.
“Q. Now, at the time you saw her in March of 1953 what was her mental condition at that time? A. Oh, she was mentally off. She didn’t seem to know anything. She didn’t seem to respond to any questions. She didn’t seem to know anything especially. Her mind was not clear.
“Q. Would you say that at that time she was incapable of handling any business affairs ? A. Oh, I would say so, yes. I would say she was.
“Q. It would have been totally impossible for her to handle any business? A. I would say so, yes, sir.
“Q. In other words, she was really in bad shape mentally? A. Yes, she was in bad shape mentally and. physically.
* * * * * *
“Q. Well, then from March 7th, 1953 on until the day of her death— you say you saw her at the date of her death? .A. Yes, sir.
“Q. I mean, during all of that period was she mentally incompetent to handle her business affairs? A. I think so, yes.
* * * * % *
“Q. Doctor, as I understand your testimony in 1953 you saw Mrs Tranum at intervals and you saw her in 1954 at intervals and you saw her up until the date of her death and you saw her on the date of her death in January of 1955? A. Yes, sir.
“Q. I want to ask you if she was mentally off on every occasion that you saw her? A. Mentally off everytime that I saw her, yes, sir.”
This testimony is largely corroborated by that of Dr. A. A. Herold, of Shreveport, who had treated Mrs. Tranum during her illness in 1951 and who was called to see her in 1954. He said that in 1951 she had high blood pressure, suffered from some cerebral arteriosclerosis, and' showed signs of mental incapacity. As to her condition when he last saw Mrs. Tranum he testified:
“Q. You were called in when she was admitted to the Physicians and Surgeons Hospital on July 31, 1954, is that right, Doctor? A. Yes. She was admitted to Dr. Rougon’s service. Knowing that' I had seen her before, he called me over there to see her again.
*75 "Q. What was her mental condition in 1954, in July? A. It had deteriorated a good deal by that time. She wasn’t clear on anything we asked her.
“Q. In other words, her mentality was entirely gone, you might say, in 1954? A. More or less, yes, sir. More or less.
“Q. Now, in 1954, I might ask you, at that time was she capable of handling her business affairs or managing her person, even? A. I am sure that she was not.
“Q. I believe you so certified in her interdiction suit, did you not, Doctor? A. Yes.”
Further corroboration of Dr. Brown’s testimony is found in that of Dr. Edith W. Rigsby, a specialist in mental disorders who treated Mrs. Tranum in July and August, 1954 and who said that Mrs. Tranum was at that time suffering from the last stages of cerebral arteriosclerosis and cerebral anemia — a condition that results in actual organic deterioration of the brain cells. As to the decedent’s then mental competence Dr. Rigsby testified in part:
“Q. I Want to bring out just one more thing. Doctor, at the time you examined Mrs. Tranum in July and August of 1954, was she mentally capable of handling her person and her business affairs ? A. She was definitely mentally not capable of handling her person or her business affairs. In fact, I recommended that she be given permanent institutional care. She was incontinent, and she demanded constant supervision.
“Q. She could not control her person? A. That is right. Her personal cleanliness or her physiological functions.
“Q. And you say that she was certainly mentally incapable of handling any business transactions? A. She was disoriented. She didn’t know people. She didn’t recognize me from day to day. She didn’t know the time of the day or the year or the month, or where she was.
“Q. Was that condition at that time obvious to any one, any layman looking at her ? A. I am sure it would have been.
“Q. And you say that the disease from which she was suffering at that time had no doubt been in progress for several years? A. Yes, it would have taken several years to have reached that state.”
Several members of the family of decedent also testified as to her total lack of mental capacity in 1953 and 1954, they having noticed the gradual development of it since prior to 1951. Mrs. Perot, a sister and the plaintiff herein, stated that *77 because of such condition she would have instituted interdiction proceedings much earlier than she did had not Mrs. Arnold expressed the feeling that it was “just awful to interdict anybody.”
Again, three of the closest friends of Mrs. Tranum (one who had lived across the street from 1942 until 1951 and two who had been closely associated with her for approximately forty years) testified as to certain peculiarities in her conduct during 1949, 1950 and the early part of 1951 which gave evidence of her not then being entirely normal. Two of these friends also said that the condition worsened, so much so that when they saw her in Campti in December, 1952 she would hardly speak to them — she just sat and said nothing, answering only in monosyllables when spoken to. All of these witnesses further noticed that whereas at one time the decedent had been a friendly, hospitable, precise, neat and clean person, she since had withdrawn herself, not wanting to talk to her old friends; had failed to properly care for her personal needs, becoming untidy and dirty and neglecting to eat regularly; and she no longer took an interest in anything, always being moody.
To contradict the above discussed evidence the defendant offered but two disinterested witnesses. One of these was a physician who had never attended the decedent and who answered only hypothetical questions. The other was a seamstress who occasionally made dresses for Mrs. Arnold and Mrs. Tranum in the former’s home; however, her testimony was not entirely favorable to the defendant. While she did say that Mrs. Tranum always appeared to be perfectly normal she admitted that the decedent never once suggested how a dress was to be made or what materials were to be used — that she performed her sewing almost entirely according to Mrs. Arnold’s instructions.
The only other witnesses testifying for the defendant were himself, his mother and his wife. Apparently the trial court did not (nor can we) give too much credence to the defendant’s testimony. It was quite evasive; and often he displayed a “short” memory when questioned closely about facts and circumstances relating to the purported donations, replying in many instances that he did not remember.
Like the defendant, Mrs. May Arnold testified that Mrs. Tranum, up until her illness in 1954, was mentally normal — her conversation was intelligent, she was not irritable, she attended to her business affairs and did her own banking, she liked to go and often went places, and she had frequent visitors with whom she freely conversed. However, we deem it important to note that, despite these assertions, the defendant was able to produce but the one above mentioned disinterested witness (the seamstress) to corroborate his and his mother’s testimony. Also, it is to be noticed *79 that Mr. P. A. Cloutier, who was an officer of the Campti bank in which Mrs. Tranum had her account and a totally disinterested witness, stated emphatically that she had been in such bank not more than two or three times and then shortly after she came to Campti in 1951; and no other witness testified that he had even seen Mrs. Tranum outside the house. Furthermore, Mrs. Arnold conceded that most of the checks drawn on the bank account of Mrs. Tranum (during her stay in Campti of some three years) were written by some one else (usually Mrs. Arnold) and were merely signed by the decedent. In this connection we further think it significant that all of the proceedings necessary to transfer the disputed funds and stock to the defendant (writing letters, obtaining signature verification, etc.) were handled by him, Mrs. Tranum having done nothing more than affixing her signature where necessary.
The defendant relies strongly on certain memoranda and letters written by Mrs. Tranum as being indicative of her sound mental capacity. We have examined these offerings carefully and are not quite certain that all of them so indicate; some might be said to suggest a different conclusion. Be that as it may we notice that all were dated sometime before the last two purported donations were made.
Our attention is directed by defendant to many entries in decedent’s diaries (introduced in evidence by him) in which his aunt referred to him in affectionate terms. He urges that these show his close relationship with her and a reason for her preferring him over the other members of the family. This fact loses much of its significance, however, when it is also noticed that here are numerous references in the diaries to other members of the family and to close friends, many of them showing deep affection for these persons and expressing gratitude for kindnesses rendered to Mrs. Tranum by them. Too, some of the entries tend to corroborate testimony offered in plaintiff’s behalf that Mrs. Tranum’s mental deterioration commenced several years prior to the making of the assailed gifts — even as early as 1949. And we are further impressed by the fact that after her collapse in 1951 decedent no longer kept a diary, whereas previously she wrote in one daily.
 In view of the foregoing we have concluded, as above indicated, that the record amply sustains the district court’s finding that Mrs. Tranum did not possess sufficient mental capacity to make the purported donations of April 7, 1953 and June 15, 1953. On the other hand, we likewise agree that plaintiff has not proved, with the certainty required by law, decedent’s total lack of capacity as of January 4, 1952; and, hence, that the assailed donation of that date must be maintained.
*81 Inapposite are the decisions cited by defense counsel in support of the contention that plaintiff’s proof is insufficient to establish a lack of mental capacity on the part of Mrs. Tranum in 1953. In some of them either the evidence fell far short of that adduced in the instant case, both in character and quantity; or, where there was substantial evidence, it was overcome by conflicting medical and lay testimony showing capacity. Other cited cases, unlike the present one, dealt with an intermittent type of insanity or a temporary insanity brought about by some extreme physical condition. Here the evidence clearly establishes that Mrs. Tranum’s primary ailment (cerebral arteriosclerosis) was of the kind that produces a gradual deterioration of the brain— a type of mental derangement that could only and did worsen with the passage of time. True, in 1954 Mrs. Tranum also suffered form a kidney disorder that caused a toxic condition and might have produced certain mental aberrations. However, as stated by her attending physician Dr. Rigs-by, the “symptoms of the infection of the kidney responded to medical care and her fever came down, hut she still remained mentally confused, irrational and disoriented * *
For the reasons assigned the judgment appealed from is affirmed.
SIMON, J., absent.